**OCEAN S. S. CO. OF SAVANNAH v. ALLEN, Collector of Internal Revenue.**

No. 76.

District Court, M. D. Georgia, Macon Division.

Jan. 30, 1941.

T. M. Cunningham, of Savannah, Ga., for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe and Thomas G. Carney, Sp. Assts. to the Atty. Gen., and T. Hoyt Davis, U. S. Atty., of Macon, Ga., for defendant.

DEAVER, District Judge.

Ocean Steamship Company of Savannah (hereinafter called the Steamship Company) brought its complaint against Marion Allen, Collector of Internal Revenue, District of Georgia (hereinafter called defendant), to recover $17,981.46 taxes paid January 17, 1940, besides interest from that date at the rate of 6% per annum. The taxes were paid under the Carriers Taxing Act of 1937, 50 Stat. 435, 45 U.S.C.A. § 261 et seq., 26 U.S.C.A. Int.Rev.Code, § 1500 et seq., which is the companion Act to the Railroad Retirement Act of 1937, 50 Stat. 307, 45 U.S.C.A. § 228a et seq. which provides old age benefits for retired employees. The case involves the application and construction of Section 1(a) of the Carriers Taxing Act of 1937, which is codified in Internal Revenue Code as Section 1532(a), 26 U.S.C.A. Int.Rev.Code, § 1532(a), the material part of which reads as follows:

"The term 'employer' means any carrier (as defined in subsection (h) of this section), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad * * *.

"The term 'employer' shall also include railroad associations, traffic associations, tariff bureaus, demurrage bureaus, weighing and inspection bureaus, collection agencies and other associations, bureaus, agencies, or organizations controlled and main-

tained wholly or principally by two or more employers as hereinbefore defined and engaged in the performance of services in connection with or incidental to railroad transportation."

(Sec. 1(i) of the Carriers Taxing Act, I.R.C. Sec. 1532(h), 26 U.S.C.A. Int.Rev. Code, § 1532(h). The term "carrier" is defined as follows: "The term 'carrier' means an express company, sleeping-car company, or carrier by railroad, subject to part I of the Interstate Commerce Act."

The case was tried before the Judge without a jury.

The suit is at common law for money had and received.

The Commissioner of the Department of Labor of the State of Georgia filed a motion for leave to intervene in this case, under the provisions of Rule 24 (b) (2) of the Rules of Civil Procedure for the District Courts of the United States, 28 U.S. C.A. following section 723c, which motion was resisted by the defendant. The Commissioner administers the Georgia Unemployment Compensation Act, Acts 1937, p. 806. The Steamship Company has heretofore been paying unemployment taxes under the Georgia Act and under Title IX of the Social Security Act, 49 Stat. 639, Sec. 1600, I.R.C., 26 U.S.C.A. Int.Rev.Code, § 1600, 42 U.S.C.A. § 1101 et seq. Under the scheme of these two last mentioned acts the Steamship Company gets a credit on the Federal Unemployment Insurance Tax of 90% for payments of pay roll contributions under the State Unemployment Compensation Act. Congress passed on June 25, 1938, the Railroad Unemployment Insurance Act, 52 Stat. 1094, U.S.C.A. Title 45, Sec. 351 et seq., which supersedes Title IX of the Social Security Act and all State Unemployment Compensation Acts for the class of employees within the Railroad Unemployment Insurance Act. The definition of the term "employer" under the Railroad Unemployment Insurance Act is precisely the same as the definition of "employer" under the Carriers Taxing Act of 1937 quoted above, so that if the Steamship Company falls under the Carriers Taxing Act of 1937 and its companion Act, the Railroad Retirement Act of 1937, it would fall under the Railroad Unemployment Insurance Act, and the State of Georgia would be deprived of the contributions of the Steamship Company under the Georgia Unemployment Act. The contention of the movant is that the questions of law and fact which arise in this case are common to such as would arise under the Railroad Unemployment Insurance Act.

I have concluded to overrule the motion to intervene for the following reasons: The Railroad Unemployment Insurance Act is administered both as to the taxes imposed by that Act and as to the distribution of the taxes raised thereunder by the Railroad Retirement Board, whereas under the federal railroad pension laws the tax is administered by the Commissioner of Internal Revenue under the Carriers Taxing Act of 1937, and the pensions are disbursed by the Railroad Retirement Board under the Railroad Retirement Act of 1937. As the Commissioner of Internal Revenue and the defendant in this case are not concerned with the administration of the Railroad Unemployment Insurance Act, and neither the Railroad Retirement Board nor the Social Security Board is a defendant in this case, I do not see how any judgment I might render in reference to the Railroad Unemployment Insurance Act would be binding on any one. If the motion to intervene were granted, there is no judgment I could render in favor of the intervenor. If a judgment is rendered in this case for the plaintiff, the movant would have just as much advantage of it if he is not a party to the case as he would get if he were a party. The movant has been permitted to file a brief in the case as amicus curiae, and has had all of the practical advantages he could get if his motion to intervene had been allowed. The motion to intervene is accordingly disallowed.

### Findings of Fact

1. The Steamship Company made a return under protest January 17, 1940, to the defendant, of the employers' tax and the employees' tax under the Carriers Taxing Act of 1937 for the period January 1, 1937, to April 1, 1937. The return was made for the sum of $17,981.46, and this amount paid by the Steamship Company to the defendant under protest and under duress on January 17, 1940. A claim for refund of the tax paid with interest was duly made, and the claim was disallowed by the Commissioner of Internal Revenue May 20, 1940.

2. The tax on the employees of the Steamship Company was paid by the Steamship Company, was not deducted from their compensation and has not been reimbursed the Steamship Company.

3. The Steamship Company has heretofore made returns for itself and its employees under Title VIII of the Social Security Act, 42 U.S.C.A. § 1001 et seq., the last return made by the Steamship Company being for the period ended June 30, 1939.

4. The defendant is Collector of Internal Revenue for the District of Georgia and resides in this judicial district.

5. Ocean Steamship Company of Savannah is a corporation created by the Legislature of the State of Georgia August 26, 1872, as a navigation company; and the principal office of the corporation is in Savannah, Georgia.

6. The Steamship Company pursues the business of a common carrier by water of both freight and passengers, and operates a fleet of steamships between Savannah, Ga., and Boston, Mass., via New York.

7. The capital stock of the Steamship Company is 20,000 shares of the par value of $100 per share. All of the capital stock was formerly owned by Central Railroad & Banking Company of Georgia. 19,950 shares of this stock was pledged, together with other securities, by the last named Company to Central Trust Company of New York, as trustee, under a mortgage known as the collateral trust mortgage, to secure an issue of five million dollars of bonds, which are now reduced to $4,840,-000. These 19,950 shares of the capital stock of the Steamship Company are registered on the books of the Steamship Company in the name of Central Trust Company of New York, trustee. Central Trust Company of New York was merged into Central Hanover Bank & Trust Company, which is now the trustee under said collateral trust mortgage. Receivers were appointed for the properties of Central Railroad & Banking Company of Georgia in 1892, and upon reorganization of that Company in 1895, Central of Georgia Railway Company succeeded to most of the properties, including the equity in the 19,-950 shares of the Steamship Company stock, and the equity in the other collaterals securing said collateral trust mortgage. Central of Georgia Railway Company pledged its equity in the 19,950 shares of the Steamship Company stock under the Railway Company's First Mortgage securing seven million dollars of bonds, under its consolidated mortgage securing eighteen million five hundred thousand dollars of bonds, under its first, second and third preference income bonds, of which two hundred and sixty-nine thousand dollars are outstanding, and under its refunding and general mortgage bonds, of which there are twenty-nine million dollars outstanding. Fifty shares of the capital stock of the Steamship Company are owned by Central of Georgia Railway Company and are unpledged, and ten shares are registered in the names of the ten Directors of the Steamship Company. The collateral trust bonds of Central Railroad & Banking Company of Georgia have never been in default. They matured May 1, 1937, and were extended for a period of five years, upon the receiver of Central of Georgia Railway Company agreeing to pay the interest on the bonds. Illinois Central Railroad Company and one of its subsidiaries own the capital stock of Central of Georgia Railway Company.

8. All of the property of Central of Georgia Railway Company was placed in the hands of H. D. Pollard as receiver, December 19, 1932, under a bill in equity of Alabama Fuel & Iron Company v. Central of Georgia Railway Company, filed in the United States District Court for the Southern District of Georgia, alleging the insolvency of the Railway Company. June 19, 1940, the property of Central of Georgia Railway Company, on its petition filed in the United States District Court for the Southern District of Georgia was transferred from the equity receivership to a proceeding for the reorganization of the said debtor under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, and H. D. Pollard and A. B. Lovett were appointed trustees of the property of the debtor, and are now operating the railroads of Central of Georgia Railway Company as such trustees. The property of Ocean Steamship Company of Savannah was not put in the hands of receivers when the receivership of Central of Georgia Railway Company was instituted in December, 1932, nor was the property of the Steamship Company affected by the said proceeds under Section 77 of the Bankruptcy Act. The Steamship Company continued to be and is now operated and controlled by its own corporate officers, and its own board of directors.

9. Illinois Central Railroad Company, Central of Georgia Railway Company, except insofar as the operations and possession of its property are concerned, and

854

H. D. Pollard and A. B. Lovett as trustees of the property of Central of Georgia Railway company are each common carriers by railroad, subject to Part I of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq.

10. Ocean Steamship Company of Savannah is a company which is directly or indirectly owned or controlled or under common control with a carrier by railroad subject to Part I of the Interstate Commerce Act.

11. The Steamship Company engages in through transportation of freight with carriers by railroad. In all such cases the through transportation is the result of mutual arrangements or agreements between the participating carriers, and the transportation and the rates are controlled and prescribed by tariffs to which the participating carriers are parties, filed and published in accordance with the Interstate Commerce Act. In all such cases of through transportation the tariffs state the rate in a gross sum and do not show the component parts of the rate or how the rate shall be divided between the participating carriers for the services rendered by each of them in the through transportation. The division of the through rate between the participating carriers is a matter of mutual agreement between them, and, ordinarily, it makes no difference to the shipper or consignee how the participating carriers divide the through rate. The through rates are divided between the participating carriers in a variety of ways as appears hereafter, and the manner of the settlement between them is also done in a variety of ways as appears hereafter. All of the traffic under review in this case and hereinafter referred to is through traffic, none of it is port to port traffic.

12. The interchange of through traffic between the Steamship Company and its rail connections at Savannah is conducted as follows:

The Steamship Company owns its own terminals at Savannah. The tracks of the Central of Georgia Railway connect with the Steamship Company Terminals. The Steamship Company Terminals are covered terminals and the railroad tracks lead into the Steamship Terminals. The tracks in the Steamship Terminals are owned by the Steamship Company. The tracks run into the Steamship Terminals in a saw-tooth arrangement. The distance from the tracks to the ships' berth is about 150 feet, the distance varying according to the number of cars on the tracks. On the northbound movement, the cars are placed by the Central of Georgia on the tracks in the Steamship Terminals and the Steamship Company, when it is ready to load its ship, breaks the seals of the cars, unloads the cars, and trucks the freight into the ship. On southbound traffic, the Steamship Company trucks the freight directly from the ships into the cars, which are placed by the Central of Georgia on the Steamship Terminal's tracks. The Steamship Company also dunnages freight in the cars and braces it. Several years ago the Railroad loaded and unloaded cars and the Steamship Company trucked the freight to and from the ship; but this practice was discontinued. One set of employees transfers the freight from the cars to the ship and vice versa because it is more economical and more convenient to handle the transfer in this way. It is more convenient to handle the transfer in this way for the ship because the Steamship Company can load and unload the cars at its convenience and prevent its wharves from becoming congested with freight. The Steamship Company interchanges through traffic at Savannah with Atlantic Coast Line, Seaboard Air Line, Southern Railway, Atlanta & Savannah Railway. The manner of handling the traffic interchanged with these lines is precisely the same as when the traffic is interchanged with the Central of Georgia, except that Central of Georgia is the only railroad which has track connections with the Steamship Terminals; therefore, the switching service in all cases is performed by the Central of Georgia. The Merchants & Miners Transportation Company operates a line of ships from Savannah to Baltimore. When through traffic is interchanged between the Merchants & Miners Transportation Company and the railroads at Savannah, the loading and unloading of the cars is done by the Merchants & Miners Transportation Company, and the traffic is interchanged in exactly the same physical manner as it is interchanged at the terminals of the Steamship Company. In dividing the through rates on traffic interchanged with the rail lines at Savannah, the Steamship Company first deducts an arbitrary to cover the cost of unloading and loading and the switching services performed by the railroad. The Steamship Company then pays over to the Railroad line the switching rate; the balance of the rate

after deducting the arbitrary is divided between all the carriers in the through route.

13. The interchange of traffic between the Steamship Company and its rail connections at Boston, Mass., is conducted in the following manner:

The Steamship Company Terminal at Boston has a wharf which it leases from the Boston & Maine Railroad Company. This wharf is reached by a track of the Boston & Maine Railroad Company. The Boston & Maine Railroad does the switching for all other railroads which exchange through traffic with the Steamship Company at Boston. The tracks at Boston are about 150 feet from the ship's berth, the distance varying according to the number of cars on the tracks. The Steamship Company loads and unloads all carload freight at Boston, and trucks it directly from the cars to the ships and vice versa from the ships to the cars. Less-than-carload freight is interchanged by trucks. The Steamship Company receives from the Railroad whose car it unloads forty cents a ton. The payment made by the Railroad comes out of the Railroad's proportion of the through rate, so that in effect the cost of loading and unloading the car is paid by the shipper.

14. The interchange of through freight at New York between the Steamship Company and its rail connections is conducted as follows:

The dock of the Steamship Company at New York is not reached by any rail line. The interchange of freight between the Steamship Company and the rail lines at New York is effected by either lighters or trucks. If the interchange is done by trucks, the trucks unload the freight on the wharf. At New York all the carload freight is interchanged by lighters and the less-than-carload freight by truck. When the transfer is done by lighters, the Steamship Company loads and unloads the lighters. The Steamship Company does the loading and unloading because this suits its convenience and keeps the wharf from being congested. In the second place, the railroad companies do not have freight handlers on their lighters and could not send freight handlers to the piers. Moreover, the Union Labor situation is such that longshoremen from New Jersey could not work in New York and vice versa, longshoremen from New York could not work in New Jersey. The lighterage is performed by the rail lines except in the case of the New York Central and the Long Island Railroad. In the case of interchange with the Long Island Railroad, the Steamship Company unloads the cars and places the freight on the lighters. The Long Island does not compensate the Steamship Company for this work. The Steamship Company gets its compensation by an arbitrary which is deducted from the through rate accruing to the lines south of New York. The Long Island has no lighterage equipment. The business is competitive and unless the lines south of New York absorb this cost, the Steamship Company would lose the traffic. The amount of traffic interchanged with the Long Island Railroad is inconsequential. As to the New York Central, about twelve or fourteen years ago, the New York Central advised the Steamship Company that it had a great demand for its lighters in export and import traffic and that it wanted to transfer carload lots to the Steamship dock by truck. At that time the pier which the Steamship Company occupied was not large enough to accommodate the traffic, and as the Steamship Company had sufficient lighters, it made arrangements with the New York Central whereby the Steamship Company would use its own lighters to effect interchange with the New York Central. The New York Central pays the Steamship Company a specified rate for the lighterage and gets its compensation in turn out of the through rate. The New York Central on the southbound traffic unloads its freight from the cars on to the lighters and on the northbound traffic the New York Central discharges the lighters and loads its cars. The New York Central is compensated for the amount it pays the Steamship Company for the use of the lighters out of the through rate, so that in the end the transfer service comes out of the shipper.

15. When carload freight is moved by a rail carrier, the custom is that the shipper loads the car at origin and the consignee unloads it at destination. When the freight is interchanged between rail carriers, no unloading of carload freight is involved, but less-than-carload freight is usually unloaded by the receiving carrier.

16. Interchange of freight in through transportation between participating carriers is usually determined by agreement or conventional arrangements, whereby the point of delivery and the manner of delivery is effected.

17. At St. Louis, Missouri, the Illinois Central, the trustees of the Central of Georgia, and the Steamship Company maintain a joint traffic office for the solicitation of freight. The reason for the maintenance of this joint traffic office is to solicit traffic for the through route in which these carriers participate from Boston and New York to Savannah via the Steamship Company; to Birmingham via Central of Georgia, and to Chicago and St. Louis via Illinois Central Railroad.

At Denver, Colorado, the trustees of the Central of Georgia Railway Company, and the Ocean Steamship Company maintain a joint traffic office for the solicitation of freight for through traffic in which these carriers participate from Boston and New York to Savannah via the Steamship Company, to Birmingham via Central of Georgia, and to the West via St. Louis & San Francisco Railroad.

At London, England, the Illinois Central Railroad, the trustees of the Central of Georgia Railway Company, and the Steamship Company maintain a joint traffic office to solicit traffic imported from Europe by way of Boston or New York, moving thence via Steamship Company to Savannah, Central of Georgia to Birmingham, and Illinois Central from Birmingham.

At Savannah, the trustees of Central of Georgia Railway Company and the Steamship Company maintain a joint passenger ticket office.

At these joint traffic agencies the interested carriers contribute to the expense of operating the agencies.

18. The receiver of the property of Central of Georgia Railway Company issues a folder containing the time tables of the Railroad and a map showing the lines of the Central of Georgia Railway Company and the lines of the Ocean Steamship Company from Savannah to New York and Boston, and the line of the Merchants & Miners Transportation Company from Savannah to Baltimore. This folder also contained an advertisement of the line of the Steamship Company which contained this sentence: "For literature, reservations, tickets and all information, apply to any agent of the Central of Georgia Railway, or to the Ocean Steamship Company of Savannah." This folder also contained an advertisement of the Merchants & Miners Transportation Company, and of the Peninsular & Occidental Steamship Company

with a schedule of the latter from Port Tampa and Key West, Florida, to Havana, Cuba.

19. Central of Georgia Railway Company prefers the Ocean Steamship Company in the routing of through traffic moving to the East and the Steamship Company prefers the Central of Georgia Railway Company in routing through traffic from the East through the Port of Savannah. Central of Georgia Railway arranges its schedules of freight trains from Savannah to connect with the ships of the Steamship Company arriving at Savannah and often runs freight trains from Savannah loaded entirely with freight delivered by the Steamship Company, and arranges its passenger schedule to arrive in time for passengers to take outgoing passenger ships.

20. The directors of the Steamship Company are Leopold Adler, J. H. Allen, T. M. Cunningham, Donald Comer, Carl Espy, Mills B. Lane, H. D. Pollard, Edward R. Richardson, and B. O. Sprague. Lawrence A. Downs, lately deceased, was also a director of the Steamship Company. He was also chairman of the board of the Steamship Company, and was chairman of the board of the Illinois Central Railroad. He was paid no salary as chairman of the board of the Steamship Company. The Steamship Company does not intend to fill the vacancy in the office of the chairman of the board. Of the directors of the Steamship Company above named, E. R. Richardson is president and general manager of the Steamship Company, and he is also a director of the Central of Georgia Railway Company. H. D. Pollard is president of the Central of Georgia Railway Company, and one of the trustees of the property of Central of Georgia Railway Company. T. M. Cunningham is vice-president and general counsel of the Steamship Company, a director of Central of Georgia Railway Company, and counsel for the Trustees of Central of Georgia Railway Company. The other directors of the Steamship Company above named are not directors of Central of Georgia Railway Company or any of its associated or affiliated companies. F. S. Baggett is secretary of both the Steamship Company and of Central of Georgia Railway Company.

The following are officers of both the Steamship Company and of the trustees of Central of Georgia Railway Company in the capacities named:

H. L. Fulton, Jr., comptroller; M. B. Nichols, auditor of disbursements; K. M. Sisterhenm, treasurer. A. B. Lovett, who is one of the trustees of the property of Central of Georgia Railway Company, is not a director of Central of Georgia Railway Company, or of the Steamship Company, and has no connection with the Central of Georgia Railway Company, or any of its subsidiaries or affiliates.

The books of the Steamship Company are separate from those of the Railway Company and its cash is kept separately.

21. The Steamship Company is now and always has been operated separately and independently from the Railroad owners of its stock, and separately and independently of the trustees of the property of Central of Georgia Railway Company. The Steamship Company has no operating officers or traffic officers in common with its Railroad owners, or the trustees of the property of Central of Georgia Railway Company. Neither the Central of Georgia Railway Company, the Illinois Central, or the trustees of the property of Central of Georgia Railway Company have ever interfered with or dictated the traffic policy of the Steamship Company.

22. In all of the through shipments the initial carrier issues a bill of lading which is in the form of the uniform bill of lading prescribed by the Interstate Commerce Commission, which bill of lading shows the initial point of shipment, the final destination of the shipment, the route and the rate.

23. (a) The Steamship Company's tonnage and revenues for freight interchanged with railroads for the period January, 1936, to July, 1940, inclusive, was:

Interchange at Savannah, Georgia:

| Revenue | Tonnage |
|---|---|
| $6,838,052.00 | 1,238,603 |

Interchange at New York

| | |
|---|---|
| 2,503,978.00 | 526,466 |

Interchange at Boston

| | |
|---|---|
| 2,923,685.00 | 629,302 |

(b) The Steamship Company's tonnage and revenue from port to port freight traffic for the period January 1, 1936, to July, 1940, inclusive, was $3,345,269.

(c) The revenue of the Steamship Company derived from passenger traffic interchanged with carriers by railroads for the period January, 1936, to July, 1940, inclusive, was $190,214, of which $164,323 was interchanged with Central of Georgia Railway.

(d) The revenue of the Steamship Company from port to port passenger traffic for the period January, 1936, to July, 1940, inclusive, was $1,759,191.

(e) The revenue of the Steamship Company from export and import traffic for the period January, 1936, to July, 1940, was $239,880.

(f) The revenue of the Steamship Company from freight and passengers interchanged with Central of Georgia Railway for the period January, 1936, to July, 1940, inclusive, was $5,086,683.

(g) The total number of employees of the Steamship Company for the month of August, 1940, which was the latest available month, was:

| | |
|---|---|
| Officers | 11 |
| General office employees | 35 |
| Agency clerical employees | 59 |
| Wharf employes clerical | 70 |
| Wharf employees, labor | 840 |
| Ships' Officers and crews, | 357 |
| Tugs & Lighters | 48 |
| Offline traffic solicitation | 8 |
| | 1,428 |

24. (a) March 2, 1914, Central of Georgia Railway Company filed an application with the Interstate Commerce Commission under Section 5 of the Act to Regulate Commerce, as amended by Section 11 of the Panama Canal Act, 49 U.S.C.A. § 5, that it be permitted to operate beyond July 1, 1914, the Ocean Steamship Company of Savannah. The Illinois Central was made a party to this application. The report of the Commission on the application is contained in 37 I.C.C. 422. In this application the main question was whether there was competition, or possibility of competition, between the Steamship Company and its rail owners. If there was any such competition, the rail owners would not be required under the law to get permission to continue the ownership and operation of the Steamship Company. In that case it appeared in the evidence that the Central Railroad & Banking Company of Georgia, the predecessor of Central of Georgia Railway

Company, operated ships between Savannah and New York, but being advised that it was ultra vires for the Railroad Company to operate ships it procured the charter of the Ocean Steamship Company of Savannah, which was granted by the Legislature of Georgia in 1872. The testimony of the witnesses for the Steamship Company and its rail owners in that case was that the Steamship Company was an extension of the rails of the Central Railroad & Banking Company of Georgia. The president of the Central Railroad & Banking Company of Georgia testified in that case: "It is evident to me that the purpose of the railway company originally in investing its funds in these independent steamers and afterwards in acquiring them, that the railroad company was seeking to promote the interests of its rail lines by enabling the people along its line to reach the large markets in the East, to trade in both directions, and since then the through routes have been developed both combined water and rail routes and all-rail routes and it has been necessary for the railway company to maintain this steamer line and to foster it as far as it could, because it was the only link it had that formed a through route to the East in competition with the all-rail routes and with the steamer routes through other ports."

This same witness further testified: "I think in practice it is just as impossible for the Ocean Steamship Company to be a competitor of the Central Railroad as it is for one branch of the Central Railroad to be a competitor of another branch."

The counsel for the Railroad and Steamship Company in that case in the brief stated: "The steamship lines are and have been since 1848 an essential part of the Central System; it is incomplete without them. To separate them would so weaken the Central as to make it a prey to its competitors, and would result in a decrease of competition instead of its preservation."

In that case the Commission found that there was competition between the Steamship Company and its rail owners, but nevertheless granted permission to the Railroad owners to own and operate the Steamship Company beyond July 1, 1914.

The Interstate Commerce Commission also found as a fact that: "While the chairman of its board is also chairman of the board of the Central of Georgia and is President of the Illinois Central, the Steamship Company has no operating or traffic official in common with either the Illinois Central or Central of Georgia, and the conduct of its affairs appears to be entirely independent. The record discloses no attempt by the Central of Georgia to control or dominate the traffic or operating departments of the steamship company; nor does it appear that the Illinois Central has used its stock control of the Central to influence the affairs of the Steamship Company."

(b) In 1934, application was made by the rail owners of the Steamship Company to the Interstate Commerce Commission for authority to the Steamship Company to operate local passenger and freight service between Boston and New York. 203 I.C. C. 155, 158. The Commission granted the application and found that there was no competition between the Steamship Company and its rail owners in this particular service, confirming its findings in 37 I.C.C. 422. In the course of its opinion the Commission said that the Steamship Company was "effective principally as a link in the Central's rail-water route between the East and the Southeast."

In connection with the report of this case, the defendants put in evidence extracts from testimony taken in this second Panama Canal case, the substance of which was that the president of the Steamship Company testified that the Central and the Steamship Company are mutually dependent upon each other and anything which helps the Steamship Company helps the Railroad, and in which he also testifies that the Steamship Company, operated in connection with the Central, is a very old established transportation company, and that the Steamship Company is an extension of the Central. An extract from the brief of the counsel for the Steamship Company and its rail owners was put in evidence by the defendant, in which counsel for the applicants maintained that the conditions as between the Railroad and the Steamship Company in 1934 were the same as they were when the original Panama Canal application was filed in 1915.

(c) In 1937 the rail owners of the Steamship Company made application to the Commission to grant the Steamship Company authority to extend its present services by the establishment of its water route between New York and New York Lighterage points on the one hand and Boston, Mass., on the other, such routes to be operated as a part of through water and rail routes to and from points in Cana-

da, Central, and Western Trunk Line Territories. The report of the Commission on this application is contained in 226 I.C.C. 245. The Commission granted the application and held that the conditions as to competition between the rail owners and the Steamship Company were the same in 1937 as they were when the First Panama Canal case was before the Commission.

25. (a) All the railroads and steamship lines in Continental United States were taken over under federal control by Proclamation of the President of the United States, December 26, 1917, 40 Stat. 1733. The Proclamation of the President took over "each and every system of transportation and the appurtenances thereof located wholly or in part within the boundaries of the continental United States and consisting of railroads, and owned or controlled systems of coastwise and inland transportation, engaged in general transportation, whether operated by steam or by electric power, including also terminals, terminal companies and terminal associations," etc.

Under this Proclamation Wm. G. McAdoo was designated as Director General of Railroads. The railroads of Central of Georgia Railway Company were operated during the period of federal control by W. A. Winburn as Federal Manager under the jurisdiction of the Director General of Railroads, and as such Federal Manager he had no connection with or control over the operations of the Steamship Company, nor had he any connection with the corporate affairs of Central of Georgia Railway Company.

(b) The Steamship Company was taken over at the same time under federal control under the same Proclamation as were all coast-wise steamship lines. A separate Federal Manager was appointed for all coast-wise steamship lines, including Ocean Steamship Company of Savannah. During the six months' period previous to federal control the Ocean Steamship Company of Savannah was operated for account of the Shipping Board.

(c) The railroads of Central of Georgia Railway Company were operated under an agreement with the Director General of Railroads dated February 25, 1919. The ships of the Steamship Company were operated under a separate agreement with the Director General of Railroads dated March 29, 1919.

(d) Federal control of railroads and coast-wise steamship lines began December 31, 1917, and ended February 29, 1920.

26. The above stated contracts between the Central of Georgia Railway Company and the Steamship Company with the Director General were made under and in pursuance of the Act of March 21, 1918, 40 Stat. 451, which provides: "That the President, having in time of war taken over the possession, use, control, and operation (called herein Federal control) of certain railroads and systems of transportation (called herein carriers), is hereby authorized to agree with and to guarantee to any such carrier making operating returns to the Interstate Commerce Commission, that during the period of such Federal control it shall receive as just compensation"—an annual sum equivalent to the average annual operating income of the three years ended June 30, 1917.

The Act of Congress of February 28, 1920 (which is known as the Transportation Act of 1920), terminated federal control as of March 1, 1920, 41 Stat. 464. Under Sec. 209 of the Transportation Act, 49 U.S.C.A. § 77, the United States guaranteed to "any carrier with which a contract * * * has been made fixing the amount of just compensation under the Federal Control Act [Act of March 21, 1918, 40 Stat. 451], that the railway operating income of such carrier" for the guaranty period (6 months beginning March 1, 1920) shall be one-half the amount named in such contract as the annual compensation. It was further provided that this section should not be applicable to any carrier which does not on or before March 15, 1920, file with the Commission a written statement that it accepts all the provisions of this section.

The term "carrier" is defined in Section 209 to mean "a carrier by railroad or partly by railroad and partly by water, whose railroad or system of transportation is under Federal control [on February 29, 1920] at the time Federal control terminates," etc. Central of Georgia Railway Company and the Steamship Company filed their separate acceptances of provisions of Section 209 of the Transportation Act of 1920.

The defendant in this case put in evidence a joint application of Central of Georgia Railway and Ocean Steamship Company of Savannah to the Interstate Commerce Commission for an advance of

860

$1,500,000 on account of the payments due under Section 209 of the Transportation Act of 1920 above quoted. This application shows on its face that previously the Railway Company had filed its separate application for an advance of $500,000 and the Steamship Company had previously filed its separate application for $1,000,000. At the same time both companies filed with the Commission their request that the two applications should be consolidated and considered as one. The application which was introduced in evidence in this case was the consolidated application. While the application is consolidated, there is no confusion whatever between the amounts for which the Railway Company and the Steamship Company were separately asking advances. Paragraph 9 of the application stated: "The amount applied for herein is for account of the Railway Company $500,000; for account of Steamship Company $1,000,000." Defendant introduced in evidence the report of the Interstate Commerce Commission in the matter of the Guarantee Settlement with Central of Georgia, Finance Docket 345, 76 I.C.C. 367. The Commission determined that the amount finally due to make good the guarantee under Section 209 of the Transportation Act to the Central of Georgia Railway and the Steamship Company was $298,924.32. The report of the Commission shows separately the amount due to the Railway Company and the Steamship Company on the Guarantee.

Division 4 of the Interstate Commerce Commission in its report in reference to this Guarantee payment said: "The property involved herein consists of that of the Central of Georgia Railway Company and the Ocean Steamship Company of Savannah, which companies are under common control and management and are operated as a single system of transportation through direct connection."

There does not appear to have been any facts before the Commission to justify the statement that these two companies were under common control and management and operated as a single system of transportation through direct connection. As heretofore stated in these findings of fact, the Steamship Company has always been and is now operated separately, distinctly, and independently of Central of Georgia Railway Company, and its former receiver, and the present trustees.

27. Defendant introduced in evidence and made a reference to two reports of the Interstate Commerce Commission in the matter of the application of Central of Georgia Railway Company to guarantee the principal and interest of $1,000,000 of mortgage bonds issued by the Steamship Company, Finance Docket No. 6, 65 I.C.C. 65; Finance Docket No. 3059, 79 I.C.C. 730. The first application was made in 1920. The second application was made in 1923. The second issue of bonds was to take up and redeem the first issue, so that there was altogether only $1,000,000 of bonds outstanding. The Commission found in accordance with Section 20a(2) of the Interstate Commerce Act, 49 U.S.C.A. § 20a(2), that the assumption of obligation and liability in respect of the bonds "is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose."

28. July 10, 1937, vice-president and general counsel of the Steamship Company wrote a letter to the Social Security Board, the Railroad Retirement Board, and the Commissioner of Internal Revenue, to determine whether or not, in their opinion, the Steamship Company fell under the Carriers' Taxing Act of 1937 and the Railroad Retirement Act of 1937, or under Title VIII of the Social Security Act. This letter was acknowledged by the office of the Commissioner of Internal Revenue on July 21, 1937, in which it was stated that "careful consideration will be given to your communication and you will be further advised relative thereto at the earliest practicable date." August 5, 1937, Murray W. Latimer, chairman of the Railroad Retirement Board, replied to the letter of July 10, 1937: "The Board is therefore of the opinion that the Ocean Steamship Company of Savannah is engaged in a water transportation service, which is independent of and not merely accessorial to railroad transportation, and that although the Company is owned and controlled by a carrier by railroad, that it is not operating any equipment or performing any service in connection with the transportation of passengers or property by railroad as contemplated by Section I(a) of

the Railroad Retirement Act of 1937; that it is not an 'employer' within the meaning of the Act and that service is not creditable toward annuities under such Act."

On July 12, 1938, the Commissioner of Internal Revenue advised the Steamship Company that in his opinion the Steamship Company was subject to the Carriers' Taxing Act of 1937. July 15, 1938, the vice-president and general counsel of the Steamship Company wrote to the Commissioner of Internal Revenue and to the Railroad Retirement Board, calling attention to the diversity of their opinions and requesting them to reconsider the matter. January 24, 1939, the assistant general counsel of the Railroad Retirement Board submitted a questionnaire to the vice-president and general counsel of the Steamship Company to develop the relations between the Steamship Company and its railroad connections. March 15, 1939, answers to the questionnaire were sent to the assistant general counsel of the Railroad Retirement Board. October 20, 1939, the Commissioner of Internal Revenue in a more formal opinion held that the Steamship Company was subject to the Carriers' Taxing Act of 1937. All of the facts on which the Commissioner based this opinion are set forth in these findings of fact. Copy of the letter of the Commissioner of Internal Revenue is attached to the evidence, plaintiff's exhibit No. 15. November 20, 1939, the Railroad Retirement Board accorded the Steamship Company an informal conference on the question as to whether the Steamship Company fell under the Railroad Retirement Act, formal conference being waived. Finally, on June 6, 1940, the Railroad Retirement Board, on the basis of an opinion rendered by its General Counsel, held that the Steamship Company was an "employer" under the Railroad Retirement Act.

29. The terminus of Central of Georgia Railway is at Savannah, Georgia, and it runs thence to Augusta, Ga., Macon, Ga., Athens, Ga., Atlanta, Ga., Columbus, Ga., Chattanooga, Tenn., Birmingham, Ala., Montgomery, Ala., Andalusia, Ala., and Lockhart, Ala. A map of the lines of Central of Georgia Railway is contained in the time table folder attached as an exhibit to the evidence.

30. No issues were raised that the Steamship Company performed any service for any carrier by railroad subject to Part I of the Interstate Commerce Act, except in the particulars hereinbefore covered by these findings of fact.

### Conclusions of Law

1. The court has jurisdiction of the parties and the subject-matter.

2. The Steamship Company does not operate any equipment or facility or perform any service in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage or handling of property transported by railroad; and therefore the Steamship Company is not covered by the Carriers Taxing Act of 1937, under which this tax was assessed and paid.

3. The plaintiff is entitled to recover of the defendant the sum of $17,981.46, besides interest at the rate of 6% from January 17, 1940.

### Judgment

Whereupon, it is considered, ordered and adjudged that plaintiff, Ocean Steamship Company of Savannah, do have and recover of defendant, Marion H. Allen, Collector of Internal Revenue, District of Georgia, the sum of $17,981.46 with interest at the rate of 6% per annum from January 17, 1940, and cost of this action.