410 F.2d 1354
 UNITED STATES of America and Warren S. Lane, as Mediator, National Mediation Board, Appellants,
v.
Houston H. FEASTER, individually and as Director, Alabama State Docks Department, and the State of Alabama, Appellees.
 No. 26019.
 United States Court of Appeals Fifth Circuit.
 May 5, 1969.
 Rehearing Denied June 10, 1969.
 
 Edwin L. Weisl, Jr., Asst. Atty. Gen., Vernol R. Jansen, U. S. Atty., Mobile, Ala., John C. Eldridge, Stephen R. Felson, Attys., Dept. of Justice, Washington, D. C., for appellants.
 MacDonald Gallion, Atty. Gen., of Alabama, Montgomery, Ala., Willis C. Darby, Jr., Mobile, Ala., for appellees.
 Before GOLDBERG and AINSWORTH, Circuit Judges, and SPEARS, District Judge.
 GOLDBERG, Circuit Judge:
 
 
 1
 We seek once again to resolve a ten year old controversy thrice here.[1] The controversy on the merits is whether the National Mediation Board has the statutory authority to resolve a representation dispute among certain employees of the Alabama State Docks Department at Mobile, Alabama. There is, however, a preliminary issue which we find to be dispositive of this appeal; whether the district court had jurisdiction to enjoin the National Mediation Board from holding an election to resolve this representation dispute. We hold that the district court was without jurisdiction to enter the injunction and we reverse.
 
 I.
 
 2
 In July, 1959, the International Brotherhood of Firemen, Oilers, Helpers, Roundhouse and Railway Shop Laborers filed an application with the National Mediation Board for an investigation of a representation dispute concerning certain Alabama State Docks Department employees.[2] The Docks Department, an agency of the State of Alabama,[3] owns and operates port facilities at Mobile. Included in this operation are general cargo piers, warehouses, a grain elevator, a cold storage plant, a plant for the storage and loading of edible fats and oils, a special unloading facility for bulk ores, and a terminal railroad. The prospective constituents of the petitioning Brotherhood are all of the employees of the Docks Department except those working for the terminal railroad, which employees are already represented by unions certified under the Railway Labor Act, and the office and clerical workers.
 
 
 3
 As a jurisdictional prerequisite to its assumption of jurisdiction of this representation dispute, the National Mediation Board determined that the entire Docks Department was a "carrier" within the scope of 45 U.S.C.A. § 151, First (1954). That section provides as follows:
 
 
 4
 "First. The term `carrier' includes any express company, sleeping-car company, carrier by railroad, subject to the Interstate Commerce Act, and any company, which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service (other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad, and any receiver, trustee, or other individual or body, judicial or otherwise, when in the possession of the business of any such `carrier': Provided, however, That the term `carrier' shall not include any street, interurban, or suburban electric railway, unless such railway is operating as a part of a general steam-railroad system of transportation, but shall not exclude any part of the general steam-railroad system of transportation now or hereafter operated by any other motive power. The Interstate Commerce Commission is authorized and directed upon request of the Mediation Board or upon complaint of any party interested to determine after hearing whether any line operated by electric power falls within the terms of this proviso. The term `carrier' shall not include any company by reason of its being engaged in the mining of coal, the supplying of coal to a carrier where delivery is not beyond the mine tipple, and the operation of equipment or facilities therefor, or in any of such activities." [Emphasis added.]
 
 
 5
 In making this determination, the Mediation Board noted that the terminal railroad was concededly a "carrier" and that both the terminal railroad and the public maritime facilities were subunits of the Docks Department. Since 45 U.S. C.A. § 151, First, by its terms covers companies "under common control with any carrier by railroad," the Board concluded that the Docks Department was a "carrier" under the Act.
 
 
 6
 The Docks Department has from the beginning of this epic controversy contended that the Mediation Board erred in finding that it had jurisdiction because the Department was a "carrier." When the Board first requested the Department's books and records in order to determine which employees were eligible to vote for union representation, the Department refused the request on the ground that the Board was acting without statutory authority. After considerable skirmishing in the district court and two appeals to this court, we held that the Board had made a sufficient showing that the Department was a "carrier" to warrant an order giving the Board access to the records.[4] United States v. Feaster, 5 Cir. 1967, 376 F.2d 147, cert. denied, 389 U.S. 920, 88 S.Ct. 237, 19 L.Ed.2d 265.
 
 
 7
 After finally obtaining the books and records, the Board determined which employees should participate in the representation election and scheduled the election for March 8, 1968. The state and its Dock Department officials declined to post notices of the election and secured from the court below an injunction prohibiting the holding of the election on the ground that the Docks Department was not subject to the Railway Labor Act.[5] Thus, after a decade PAGE CONTAINED FOOTNOTES we find the statutory command to attain a prompt and orderly settlement of labor disputes[6] made a mockery in cynical disregard of the Supreme Court's hopeful but here frustrated words that there is "to be no dragging out of the controversy into other tribunals of law." Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 305, 64 S.Ct. 95, 99, 88 L.Ed. 61, 66. As we are witness these days to much vocalizing for participatory democracy, we can feel nothing but dismay at the length of the enforced employee-union disengagement here.
 
 II.
 
 8
 The National Mediation Board argues that the court below did not have jurisdiction over this controversy and that we should reverse the judgment. The Mediation Board's argument has a dual predicate: (1) that proceedings of the National Mediation Board conducted pursuant to 45 U.S.C.A. § 152, Ninth, are never subject to judicial review; and (2) assuming that this controversy may be subject to judicial review, it is not ripe for review at this time because the administrative process has not culminated in a final order.
 
 III.
 
 9
 In arguing that the representation proceedings at bar are not reviewable, the Mediation Board relies heavily on Switchmen's Union of North America v. N.L. R.B., 1943, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61. In Switchmen's Union the Supreme Court was asked to resolve a jurisdictional dispute between two unions seeking to represent certain railroad yardmen. The Court, however, refused to reach the merits of the case, holding that the matter was unreviewable. The Court explained its decision as follows:
 
 
 10
 "We do not reach the merits of the controversy. For we are of the opinion that the District Court did not have the power to review the action of the National Mediation Board in issuing the certificate.
 
 
 11
 "Sec. 24(8) of the Judicial Code, 28 U.S.C. § 41(8), 28 U.S.C.A. § 41(8) [8 FCA title 28, § 41(8)], gives the federal district courts `original jurisdiction' of all `suits and proceedings arising under any law regulating commerce.' We may assume that if any judicial review of the certificate of the Board could be had, the District Court would have jurisdiction by reason of that provision of the Judicial Code. [cases cited] But we do not think that that broad grant of general jurisdiction may be invoked in face of the special circumstances which obtain here.
 
 
 12
 "If the absence of jurisdiction of the federal courts meant a sacrifice or obliteration of a right which Congress had created, the inference would be strong that Congress intended the statutory provisions governing the general jurisdiction of those courts to control. That was the purport of the decisions of this Court in Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034, and Virginian Ry. Co. v. System Federation, R.E.D., 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789. In those cases it was apparent that but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written into the Railway Labor Act. The result would have been that the `right' of collective bargaining was unsupported by any legal sanction. That would have robbed the Act of its vitality and thwarted its purpose. Such considerations are not applicable here. The Act in § 2, Fourth writes into law the `right' of the `majority of any craft or class of employees' to `determine who shall be the representative of the craft or class for the purposes of this Act.' That `right' is protected by § 2, Ninth which gives the Mediation Board the power to resolve controversies concerning it and as an incident thereto to determine what is the appropriate craft or class in which the election should be held. [cases cited] A review by the federal district courts of the Board's determination is not necessary to preserve or protect that `right.' Congress for reasons of its own decided upon the method for the protection of the `right' which it created. It selected the precise machinery and fashioned the tool which it deemed suited to that end. * * *
 
 
 13
 * * * * * *
 
 
 14
 "Generalizations as to when judicial review of administrative action may or may not be obtained are of course hazardous. Where Congress has not expressly authorized judicial review, the type of problem involved and the history of the statute in question become highly relevant in determining whether judicial review may be nonetheless supplied.
 
 
 15
 * * * * * *
 
 
 16
 "In that connection the history of § 2, Ninth is highly relevant. It was introduced into the Act in 1934 as a device to strengthen and make more effective the processes of collective bargaining. [case cited] It was aimed not only at company unions which had long plagued labor relations [case cited] but also at numerous jurisdictional disputes between unions. Commissioner Eastman, draftsman of the 1934 amendments, explained the bill at the Congressional hearings. He stated that whether one organization or another was the proper representative of a particular group of employees was `one of the most controversial questions in connection with labor organization matters.' [citations] He stated that it was very important `to provide a neutral tribunal which can make the decision and get the matter settled.' [citation] But the problem was deemed to be so `highly controversial' that it was thought that the prestige of the Mediation Board might be adversely affected by the rulings which it would have to make in these jurisdictional disputes. [citations] Accordingly § 2 Ninth was drafted so as to give to the Mediation Board the power to `appoint a committee of three neutral persons who after hearing shall within ten days designate the employees who may participate in the election.' That was added so that the Board's `own usefulness of settling disputes that might arise thereafter might not be impaired.' [citations] Where Congress took such great pains to protect the Mediation Board in its handling of an explosive problem, we cannot help but believe that if Congress had desired to implicate the federal judiciary and to place on the federal courts the burden of having the final say on any aspect of the problem, it would have made its desire plain.
 
 
 17
 * * * * * *
 
 
 18
 "In the present case the authority of the Mediation Board in election disputes to interpret the meaning of `craft' as used in the statute is no less clear and no less essential to the performance of its duty. The statutory command that the decision of the Board shall be obeyed is no less explicit. Under this Act Congress did not give the Board discretion to take or withhold action, to grant or deny relief. It gave it no enforcement functions. It was to find the fact and then cease. Congress prescribed the command. Like the command in the Butte [A. & P.] Ry. Co. case [Butte, A. & P. Ry. Co. v. United States, 290 U.S. 127, 54 S.Ct. 108, 78 L.Ed. 222] it contained no exception. Here as in that case the intent seems plain — the dispute was to reach its last terminal point when the administrative finding was made. There was to be no dragging out of the controversy into other tribunals of law.
 
 
 19
 * * * * * *
 
 
 20
 "What is open when a court of equity is asked for its affirmative help by granting a decree for the enforcement of a certificate of the Mediation Board under § 2, Ninth raises questions not now before us. [cases cited] Reversed." 320 U.S. 300-307, 64 S.Ct. 96-100, 88 L.Ed. 63-67.
 
 
 21
 Companionate to Switchmen's Union and in full accord with its thesis are General Committee v. Missouri-K.-T. R. Co., 1943, 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76, and General Committee v. Southern Pacific Co., 1943, 320 U.S. 338, 64 S.Ct. 142, 88 L.Ed. 85. See also Brotherhood of Locomotive Firemen and Enginemen v. Louisville & N. R. Co., 6 Cir. 1968, 400 F.2d 572, cert. denied, 393 U.S. 1050, 89 S.Ct. 689, 21 L.Ed.2d 692; Brotherhood of Ry. & Steamship Clerks v. United Air Lines, 6 Cir. 1963, 325 F.2d 576, cert. dismissed as improvidently granted, 379 U.S. 26, 85 S.Ct. 183, 13 L. Ed.2d 173; Radio Officers' Union v. National Mediation Board, 1950, 86 U.S. App.D.C. 319, 181 F.2d 801; United Transport Serv. v. National Mediation Board, 1949, 85 U.S.App.D.C. 352, 179 F.2d 446; Kirkland v. Atlantic Coast Line R. Co., 1948, 83 U.S.App.D.C. 205, 167 F.2d 529; Order of Railway Conductors v. National Mediation Board, 1944, 79 U.S.App.D.C. 1, 141 F.2d 366; but cf. Brotherhood of Locomotive Firemen and Enginemen v. Kenan, 5 Cir. 1937, 87 F.2d 651; Brotherhood of Railroad Trainmen v. National Mediation Board, 1936, 66 App.D.C. 375, 88 F.2d 757.
 
 
 22
 On its face Switchmen's Union appears to preclude all review of National Mediation Board decisions in representation proceedings. The sweeping language of Switchmen's Union and its progeny, however, has been explained and narrowed somewhat in the more than two decades since the opinion was written. cf., e. g., Order of Railway Conductors v. Swan, 1947, 329 U.S. 520, 67 S.Ct. 405, 91 L.Ed. 471; Brotherhood of R. T. v. Howard, 1952, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283. During this period courts have limited Switchmen's Union by considering the factual context of the opinion (craft jurisdiction dispute), the effect of the subsequent adoption of the Administrative Procedure Act in 1946,[7] and the possibility of review by a court of equity when the National Mediation Board asks the court for affirmative help in enforcing its certificate.
 
 
 23
 (A)
 
 
 24
 It is arguable that Switchmen's Union can be distinguished from the case at bar. There the Supreme Court was faced with a jurisdiction dispute between two rival unions seeking to represent the same railroad yardmen, and the issue decided was whether the Board's use of its discretion to resolve the dispute was reviewable. "The question was not as to the power of the Board to resolve the dispute but whether it had done so in an erroneous manner." Air Line Dispatchers Ass'n v. National Mediation Board, 1951, 89 U.S. App.D.C. 24, 189 F.2d 685, 688, cert. denied, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641. Furthermore, the Supreme Court emphasized that "Generalizations as to when judicial review of administrative action may or may not be obtained are of course hazardous. Where Congress has not expressly authorized judicial review [as in the case sub judice], the type of problem involved" as well as the "history of the statute in question" becomes highly relevant. 320 U.S. at 301, 64 S.Ct. at 97, 88 L.Ed. at 64. Thus it might be said that while Switchmen's Union holds that there is no judicial review where the Board has exercised its informed discretion in resolving inter-union representation disputes, it does not preclude judicial review of questions of law which bear directly upon the jurisdiction of the Mediation Board.[8] Air Line Dispatchers Ass'n v. National Mediation Board, supra, 189 F.2d at 688; cf. Brotherhood of Railway and S. S. Clerks v. Ass'n For Ben. of Non-Contract Employees, 1965, 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133; Leedom v. Kyne, 1958, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210; International Brotherhood of Teamsters v. Brotherhood of Rail., A & S. Cl., D.C.Cir.1968, 402 F.2d 196, 205 at fn. 19, cert. denied, 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119.
 
 
 25
 (B)
 
 
 26
 It is also possible that Switchmen's Union has been partially undermined by the Right of Review provisions in the Administrative Procedure Act. In Air Line Dispatchers Ass'n v. National Mediation Board, supra, wherein the D.C. Circuit was confronted with the "purely legal question of the territorial jurisdiction of the Board," the Court wrote that Switchmen's Union had been partially undermined by these review provisions:
 
 
 27
 "The law was in this posture when the Administrative Procedure Act (5 U.S. C.A. §§ 1001-1011) was approved June 11, 1946. In § 10 it provides:
 
 
 28
 `Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion —
 
 
 29
 `(a) Right of Review. — Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.' (5 U.S.C.A. § 1009.)
 
 
 30
 "We pointed out in Kirkland v. Atlantic Coast Line R. Co., supra, that the limitations upon judicial review set forth in the Switchmen's and like cases must be considered as read into the Administrative Procedure Act; that is, review is not available under § 10 where a statute, as judicially interpreted, precludes it. * * *
 
 
 31
 "Nevertheless the purpose of § 10 is to afford review unless the matter has been committed to agency discretion — a situation not now presented — or unless Congress has otherwise decided. When, as in the Switchmen's case, it had been held that Congress had manifested its intention to exclude review the new legislation was not to be construed as changing the situation. On the other hand, the general purport of the statute is that persons suffering legal wrong because of agency action, or adversely affected or aggrieved thereby, should be allowed by § 10 to obtain judicial consideration. [citation]. The statement in the Switchmen's opinion (320 U.S. at page 343, 64 S.Ct. at page 145, 88 L.Ed. 85), referred to above, that in view of the history of the Railway Labor Act a purpose to afford judicial remedy must plainly appear should now be read in the light of the purpose of the Administrative Procedure Act subsequently enacted: `Legislative intent to forbid judicial review must be, if not specific and in terms, at least clear, convincing, and unmistakable under this bill. The mere fact that Congress has not expressly provided for judicial review would be completely immaterial.' [citation].
 
 
 32
 "(C). The type of question now presented was, as we have said, in the area of those reserved under the Railway Labor Act. This being so, and because of the nature of the question, we are of the opinion that the Administrative Procedure Act indicates a Congressional purpose to authorize review of it by the courts. Since it is not a question of the type previously held unreviewable, and since there is no explicitness in the Railway Labor Act or indication in its history of a Congressional intention to leave it exclusively to Board determination, the provisions of § 10 of the Administrative Procedure Act for court review take hold of it." 189 F.2d at 685.
 
 
 33
 But cf. American Air Export & Import Co. v. O'Neill, 1954, 95 U.S.App.D.C. 274, 221 F.2d 829.
 
 C.
 
 34
 Switchmen's Union itself suggests a third route around its own seemingly impenetrable barrier against judicial review. cf. United States v. Feaster, supra, 376 F.2d at 150, fn. 4. The Supreme Court wrote:
 
 
 35
 "What is open when a court of equity is asked for its affirmative help by granting a decree for the enforcement of a certificate of the Mediation Board under § 2, Ninth raises questions not now before us. See Virginian Ry. Co. v. System Federation No. 40 [R.E.D.] supra, 300 U.S. pages 559-562, 57 S.Ct. pages 605, 606, 81 L.Ed. [805-807]." 320 U.S. at 307, 64 S.Ct. at 100, 88 L.Ed. at 67.
 
 
 36
 Judge Holtzoff in Aeronautical Radio, Inc. v. National Mediation Board, D.D.C. 1966, 255 F.Supp. 466, 467, focused upon this crack in the door to judicial review left by Switchmen's Union. He considered "matters that appeal to the conscience of a Court of equity" and reached the conclusion "that the strong arm of equity should not be exerted in order to compel the employer to bargain collectively with the union having a plurality of votes when by far the greater number of employees voted for no union at all." The Court of Appeals for the D.C. Circuit, without detailing the "powers of an equity court when faced with a suit for a mandatory injunction to compel compliance with section 2, Ninth of the Act," reversed the judgment of the district court. 127 U.S.App.D.C. 77, 380 F.2d 624, 627, cert. denied, 389 U.S. 912, 88 S.Ct. 237, 19 L.Ed.2d 259.
 
 
 37
 From this brief sojourn into the land of equity we know that courts have only a very, very limited equitable power to refuse enforcement of Mediation Board certifications. Limited as its role may be, equity may still ultimately play a part in the final disposition of this case. cf. Shields v. Utah Idaho C. R. Co., 1938, 305 U.S. 177, 183, 59 S.Ct. 160, 83 L.Ed. 111, 116. However, for reasons set forth infra, we do not now decide whether the district court will be forever foreclosed from dispensing equity in this controversy. We do hold that here the district court was premature in such dispensation.
 
 IV.
 
 38
 The foregoing authorities indicate that it is possible, but far from certain, that the National Mediation Board's determination that the Docks Department is a "carrier" may eventually be a proper subject for judicial review. However, even if we assume for the sake of argument that the Mediation Board's action is reviewable, we cannot reach the merits of the controversy because the case is not yet ripe for judicial involvement.
 
 
 39
 The Mediation Board has investigated the dispute, has found that it has jurisdiction, and has ordered an election. The administrative process, nonetheless, remains incomplete because the election has not been held and the Mediation Board's certificate, which "is the ultimate finding of fact prerequisite to enforcement by the courts," has not been issued. Virginian R. Co. v. System Federation, R.E.D., 1937, 300 U.S. 515, 562, 57 S.Ct. 592, 606, 81 L.Ed. 789, 807. Accord, Eastern Greyhound Lines v. Fusco, 6 Cir. 1963, 323 F.2d 477, 479.
 
 
 40
 Except for three special and narrow exceptions to be discussed infra, judicial review of administrative determinations is generally limited to final orders or actions. This general rule is particularly appropriate to the resolution of labor representation disputes since the Act places a great premium on speed and seeks to limit the opportunity for "dilatory tactics which would postpone the commencement of bargaining when the employer [has] no substantial objections to the conduct of the election other than a desire to delay bargaining as long as possible." Boire v. Miami Herald Publishing Co., 5 Cir. 1965, 343 F.2d 17, 20, cert. denied, 382 U.S. 824, 86 S.Ct. 56, 15 L.Ed.2d 70. In accord with this statutory policy, the Supreme Court has held that an employer's attempt to litigate a question of statutory construction prior to final Labor Board action "is at war with the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. That rule has been repeatedly acted on in cases where, as here, the contention is made that the administrative body lacked power over the subject matter." Myers v. Bethlehem Shipbldg. Corp., 1937, 303 U.S. 41, 50-51, 58 S.Ct. 459, 463, 82 L.Ed. 638, 644. See also Marine Engineers Beneficial Ass'n v. Interlake S. S. Co., 1962, 370 U.S. 173, 82 S.Ct. 1237, 8 L.Ed.2d 418; Bokat v. Tidewater Equipment Company, 5 Cir. 1966, 363 F.2d 667; Howard v. St. Louis-San Francisco Ry. Co., 8 Cir. 1966, 361 F.2d 905, cert. denied, 385 U.S. 986, 87 S.Ct. 598, 17 L.Ed.2d 448; Chicago Automobile Trade Ass'n v. Madden, 7 Cir. 1964, 328 F.2d 766, cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747; Atlanta Metallic Casket Co. v. United Paperworkers, N.D. Ga.1949, 87 F.Supp. 718; cf. N.L.R.B. v. Local 254, Building Service Employees Int. Union, 1 Cir. 1967, 376 F.2d 131, 135, cert. denied, 389 U.S. 856, 88 S.Ct. 86, 19 L.Ed.2d 123.
 
 
 41
 In view of these strong policies and authorities making the administrative assertion of jurisdiction unassailable prior to the exhaustion of agency decisional options, we hold that this controversy has not yet ripened for judicial intervention.[9] See Local 130, Intern. Union of Elec., R. & M. Wkrs. v. McCulloch, 1965, 120 U.S.App.D.C. 196, 345 F.2d 90. This case does not fall within any of the exceptions to the general rule of jurisdictional claustration:
 
 
 42
 "One exceptional set of circumstances is presented where the suit tenders `public questions particularly high in the scale of our national interest because of their international complexion.' McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 17, 83 S.Ct. 671, 675, 9 L.Ed.2d 547, 552 (1963). Another exception, which has been fashioned primarily by the Second Circuit, comes into play where there is a substantial showing that Board action has violated the constitutional rights of the complaining party. See Fay v. Douds (2 Cir. 1949) 172 F.2d 720. The third exception, on which the appellee relies strongly, is predicated on the Supreme Court's decision in Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). There the court upheld a district court injunction setting aside a Board election and certification where the Board had clearly acted `in excess of its delegated powers and contrary to a specific prohibition in the Act.' 79 S.Ct. at 184, 3 L.Ed.2d at 214. The courts have generally interpreted Kyne as sanctioning the use of injunctive powers only in a very narrow situation in which there is a `plain' violation of an unambiguous and mandatory provision of the statute. [cases cited]." Boire v. Miami Herald Publishing Co., supra, 343 F.2d at 21.
 
 
 43
 (A)
 
 
 44
 The first exception is found in McCulloch v. Sociedad Nacional de Marineros de Honduras, 1963, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547, wherein the Supreme Court permitted review of an NLRB election order because of the international overtones involved in the Board's application of the National Labor Relations Act to foreign maritime crews:
 
 
 45
 "While here the Board has violated no specific prohibition in the Act, the overriding consideration is that the Board's assertion of power to determine the representation of foreign seamen aboard vessels under foreign flags has aroused vigorous protests from foreign governments and created international problems for our Government. Important interests of the immediate parties are of course at stake. But the presence of public questions particularly high in the scale of our national interest because of their international complexion is a uniquely compelling justification for prompt judicial resolution of the controvery over the Board's power. No question of remotely comparable urgency was involved in Kyne [infra], which was a purely domestic adversary situation. The exception recognized today is therefore not to be taken as an enlargement of the exception in Kyne."
 
 
 46
 In the case at bar we find none of the international urgency present in Sociedad Nacional,[10] and we therefore conclude that Sociedad Nacional does not provide a passport through the obstacles to pregestational judicial interference. Accord, Boire v. Greyhound Corp., 1964, 376 U.S. 473, 480-481, 84 S.Ct. 894, 11 L.Ed.2d 849, 854-855.
 
 (B)
 
 47
 A second exception to the rule of exhaustion was fashioned by the Second Circuit in Fay v. Douds, 2 Cir. 1949, 172 F.2d 720. This exception permits judicial interdiction of the administrative process "where there is a substantial showing that Board action has violated the constitutional rights of the complaining party." Boire v. Miami Herald Publishing Co., supra, 343 F.2d at 21; cf. Local 1545, United Brotherhood of Carpenters and Joiners v. Vincent, 2 Cir. 1960, 286 F.2d 127, 130-131. Attempting to invoke this principle, the Docks Department alleges that the failure of the Board to hold a hearing before determining its carrier status was a denial of due process which had the effect of vesting the district court with jurisdiction.
 
 
 48
 We hold that this contention is "transparently frivolous" since this Court has already considered it and deemed it to be without merit. In United States v. Feaster, supra, 376 F.2d at 150, fn. 3, we read:
 
 
 49
 "The State has, at all stages, objected to the Board's making a determination of carrier status without a hearing. The Board acts more in the capacity of a referee; there is no requirement of a hearing at any stage of the matter. The Board does not enter orders, and its only ultimate finding of fact is the certificate. [cases cited] `[T]he Board's duty to investigate is a duty to make such investigation as the nature of the case requires. An investigation is `essentially informal, not adversary'; it is `not required to take any particular form.' * * * Congress has simply told the Board to investigate and has left to it * * * the methods and procedures which it should employ in each case.'"
 
 
 50
 This language clearly means that the function of the Board is investigatory, not adjudicatory, and therefore that "`the full panoply of judicial procedures [need not] be used.'" WES Chapter, Flight Eng. Int. Ass'n v. National Mediation Board, 1962, 114 U.S.App.D.C. 229, 314 F.2d 234, 238, quoting from Hannah v. Larche, 1959, 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307. We therefore hold that due process does not require a hearing in this situation. See Switchmen's Union of North America v. National Mediation Board, supra, 320 U.S. at 304, 64 S.Ct. at 98, 88 L.Ed. at 66-67.
 
 
 51
 Furthermore, we note that "there is some question whether our prior decisions have recognized [the Fay v. Douds] exception, at least where an employer invokes it." Boire v. Miami Herald Publishing Company, supra, 343 F.2d at 21, fn. 7. See Volney Felt Mills v. Le Bus, 5 Cir. 1952, 196 F.2d 497.
 
 
 52
 (C)
 
 
 53
 The third and most important exception to the exhaustion doctrine was developed by the Supreme Court in Leedom v. Kyne, 1958, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210.[11] In that case the Supreme Court permitted review of the NLRB's certification of a bargaining unit which included both professional and nonprofessional employees even though the professional employees had not consented to inclusion in the otherwise nonprofessional unit. This action was a brazen defiance of the express provisions of 29 U.S.C.A. § 159(b) (1).[12] The District Court, whose judgment was affirmed by the Second Circuit, held that the Board had acted in excess of its powers and set aside the Board's determination even though it was not a "final order." "On the Board's appeal it did not contest the trial court's conclusion that the Board, in commingling professional with nonprofessional employees in the unit, had acted in excess of its powers and had thereby worked injury to the statutory rights of the professional employees. Instead, it contended only that the District Court lacked jurisdiction to entertain the suit." 358 U.S. at 187, 79 S.Ct. at 183, 3 L.Ed.2d at 213. In this extreme factual context, the Supreme Court held that the District Court had original jurisdiction:
 
 
 54
 "This suit is not one to `review,' in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act. * * * Plainly, this was an attempted exercise of power that had been specifically withheld. It deprived the professional employees of a `right' assured to them by Congress. Surely, in these circumstances, a Federal District Court has jurisdiction of an original suit to prevent deprivation of a right so given.
 
 
 55
 * * * * * *
 
 
 56
 "Here, differently from the Switchmen's case, `absence of jurisdiction of the federal courts' would mean `a sacrifice or obliteration of a right which Congress' has given professional employees, for there is no other means, within their control [case cited] to protect and enforce that right. And `the inference [is] strong that Congress intended the statutory provisions governing the general jurisdiction of those courts to control.' [citation] This Court cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers. [cases cited].
 
 
 57
 "Where, as here, Congress has given a `right' to the professional employees it must be held that it intended that right to be enforced, and `the courts * * * encounter no difficulty in fulfilling its purpose.' [case cited]
 
 
 58
 The Court of Appeals was right in holding, in the circumstances of this case, that the District Court had jurisdiction of this suit, and its judgment is affirmed."
 
 
 59
 Leedom v. Kyne could easily have opened the doors of the federal courts to matters which Congress has declared are to be, initially at least, the arbitraments of the Mediation Board and the NLRB. History and the Supreme Court, however, have shown the contrary to be the case:
 
 
 60
 "It is sometimes said that in Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), the Court created an `exception' to the doctrine of Switchmen's Union. In Kyne, it was held that the law afforded a remedy in the courts when unlawful action by the National Labor Relations Board inflicted injury on one of the parties to a bargaining dispute. But this was no exception to Switchmen's Union. Rather the Court was careful to note that `[t]his suit is not one to "review," in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act.' Leedom v. Kyne, 358 U.S. 184, 188, 79 S.Ct. 180, 184 [3 L.Ed.2d 210, 214]. (Emphasis supplied.) The limited nature of this holding was re-emphasized only last Term where we referred to the `narrow limits' and `painstakingly delineated procedural boundaries of Kyne.' Boire v. Greyhound Corp., 376 U.S. 473, 481, 84 S.Ct. 894, 899, 11 L.Ed.2d 849 [855] (1964). It is with these principles in mind that we turn to the questions in the instant cases." Brotherhood of Railway and S. S. Clerks v. Ass'n For Ben. of Non-Contract Employees, 1965, 380 U.S. 650, 659, 85 S.Ct. 1192, 1197, 14 L.Ed.2d 133, 140.
 
 
 61
 Today, therefore, Leedom v. Kyne represents only a narrow and rarely successfully invoked exception to the doctrine that exhaustion of administrative procedures is a condition precedent to federal court jurisdiction. Under this exception access to the courts is accorded only if the Mediation Board's determination is infused with error which is of a summa or magna quality as contraposed to decisions which are simply cum error. Only the egregious error melds the Board's decision into justiciability. Lesser malignancies thwart the jurisdiction of the courts. Modern Plastics Corporation v. McCulloch, 6 Cir. 1968, 400 F.2d 14, 17; Teamsters, Chauffeurs, Helpers and Delivery Drivers Local 690 v. N.L.R.B., 9 Cir. 1967, 375 F.2d 966; UNA Chapter, Flight Engineers' Intern. Ass'n v. National Mediation Board, 1961, 111 U.S.App.D.C. 121, 294 F.2d 905, cert. denied, 368 U.S. 956, 82 S.Ct. 394, 7 L.Ed.2d 388; Int. Ass'n of Tool Craftsmen v. Leedom, 1960, 107 U.S.App.D.C. 268, 276 F.2d 514, cert. denied, 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 46; accord, Potter v. Castle Construction Co., 5 Cir. 1966, 355 F.2d 212, 217. With these strictures in mind, we turn to the merits of this case to determine whether there was such an obvious or gross misapplication of statutory dictates that jurisdiction was vested in the district court, or whether the district court erred in not dismissing for lack of jurisdiction.[13]
 
 V.
 
 62
 In determining that the Docks Department was a "carrier," the Mediation Board gave a literal reading to 45 U.S. C.A. § 151, First, which provides in relevant part:
 
 
 63
 "The term `carrier' includes any express company, sleeping-car company, carrier by railroad, subject to the Interstate Commerce Act, and any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad * * * (Emphasis supplied.)"
 
 
 64
 The Mediation Board, as noted earlier in the opinion, found that the Terminal Railroad was concededly a "carrier" and that the State of Alabama controlled both the Docks Department and the Terminal Railroad. Since the Docks Department was "under common control with [a] carrier by railroad," the Mediation Board reasoned that the Docks Department was a "carrier."
 
 
 65
 The Docks Department argues that the Mediation Board's determination, although in accord with the words of the Act, clearly contravenes the Congressional intent that the Railway Labor Act should regulate only the "railroad world"[14] and its essential adjuncts. In this regard it points out that the Supreme Court has "cautioned against a literal reading of congressional labor legislation; such legislation is often the product of conflict and compromise between strongly held and opposed views, and its proper construction frequently requires consideration of its wording against the background of its legislative history and in the light of the general objectives Congress sought to achieve." Wirtz v. Local 153, G.B.B.A., 1968, 389 U.S. 463, 468, 88 S.Ct. 643, 646, 19 L.Ed.2d 705, 711; accord, Pan American World Airways v. United Brotherhood of Carpenters, 9 Cir. 1963, 324 F.2d 217, cert. denied, 376 U.S. 964, 84 S.Ct. 1122, 11 L.Ed.2d 982.
 
 
 66
 It is argued that Congress did not intend for the Railway Labor Act to apply to facilities under common control with a carrier unless such facilities were closely related to the carrier's railroad transportation activities. See Northwest Airlines v. Jackson, 8 Cir. 1950, 185 F.2d 74, 77; Walling v. Baltimore Steam Packet Co., 4 Cir. 1944, 144 F.2d 130. The essence of this argument is reflected in the following language from Pan American World Airways v. United Brotherhood of Carpenters, supra, 324 F.2d at 220-221:
 
 
 67
 "The purpose of the restrictive provisions of the Railway Labor Act is to keep transportation moving. * * * The statute thus made certain that railroads could not escape the application of the statute to activities closely related to railroad transportation, by having those activities carried on by subsidiary or controlled enterprises. Here the attention of the statute was upon transportation and activities accessory to transportation. Would Congress at the same time and in the same statute, in § 151, Fifth, have intended to make the coverage of the word `employee' in the Act depend, not at all upon the employee's relation to transportation, but upon the logically irrelevant fact that his employer owned a railroad, in addition to the shoe factory in which the `employee' worked?
 
 
 68
 * * * * * *
 
 
 69
 An intent on the part of Congress to lift the employees of our hypothetical shoe factory, or of our actual Nuclear Research Development Station, out of the legal area occupied by most other workmen in the country who do exactly the same work under exactly the same conditions and surroundings, and place them, for employment relations purposes, in the `state within a state' occupied by railroad and air transportation workers would be so incongruous as to suggest that there must be some reason, though not readily apparent, why Congress entertained such an intent."
 
 
 70
 In the Pan American case the issue was whether employees of Pan American (a carrier) who were involved in preventive maintenance of electrical equipment and fuel storage facilities at a nuclear research development station were covered by the Railway Labor Act. The Ninth Circuit held that these employees had "nothing to do with transportation by air or by rail" and therefore that they were not covered by the Act. Id. at 219.
 
 
 71
 The Docks Department maintains that this rationale should be applied here. It says that the Terminal Railroad was only a minor part of the dock facility and that the primary function and activity of the docks is the loading, unloading, and storage of waterborne freight. Since the commercial emphasis of the facility is water rather than rail oriented, the Docks Department argues that it would travesty Congressional intent to hold that the Act applied to the facts of this case.[15] See Allen v. Ocean S. S. Co. of Savannah, 5 Cir. 1941, 123 F.2d 469, aff'g D.C., 36 F.Supp. 851 (steamship company controlled by railroad not "carrier" under identical definition in Carriers Taxing Act).
 
 
 72
 The Mediation Board, attempting to answer the preceding arguments, contends that its "carrier" determination is in accord both with a literal reading of the statute and with the relevant case authority. See Railroad Ret. Bd. v. Duquesne Warehouse Co., 1946, 326 U.S. 446, 66 S.Ct. 238, 90 L.Ed. 192; Southern Development Co. v. Railroad Ret. Bd., 8 Cir. 1957, 243 F.2d 351; Adams v. Railroad Ret. Bd., 9 Cir. 1954, 214 F.2d 534; Universal Carloading and Dist. Co. v. Pedrick, 2 Cir. 1950, 184 F.2d 64; Universal Carloading & Dist. Co. v. Railroad Ret. Bd., 1948, 84 U.S.App.D.C. 188, 172 F.2d 22. Moreover, it argues that the claustrophobic "railroad world" of which the Docks Department speaks so possessively and sentimentally is a world largely enshrined in museums and is unrelated to the expansionist railroad world of the Twentieth Century. The essence of the Mediation Board's argument is that the specific words of the Act cover activities which the early inventors of the iron horse never conceived and that this Court should construe the Act accordingly.
 
 
 73
 In support of its decision not to bifurcate the Mobile dock facilities between maritime and railroad activities, the Mediation Board relies heavily upon Railroad Ret. Bd. v. Duquesne Warehouse Co., supra. In Duquesne the Supreme Court held that a carrier-owned warehouse which performed functions analogous to those of the Docks Department at bar was under common control with a carrier by railroad and was therefore subject to the Railroad Retirement Act. The Court explained its decision as follows:
 
 
 74
 "We have noted the loading and unloading services rendered by Duquesne. The duty of unloading carload freight * * * is a transportation service within the meaning of the Interstate Commerce Act. * * *
 
 
 75
 "Duquesne's answer is that the service of loading and unloading is done by it for its customers, that these services are rendered before railroad transporation has begun or after it has ended, that they are not and cannot be a part of railroad transportation since the tariff of the Pennsylvania forbids it from performing the services. Duquesne's conclusion is that under such circumstances loading and unloading are not and cannot be a part of railroad transportation. The question, however, is not whether in these cases the service of loading and unloading is being rendered by the Pennsylvania and is, therefore, in fact a part of its transportation service. It is not whether the affiliate would itself be subject to the Interstate Commerce Act. It is whether a carrier's affiliate is performing a service that could be performed by the carrier and charged for under the line-haul tariffs. If it is a service, it is a transportation service within the meaning of the present Acts. * * * In other words if a service is involved which the railroad could perform as a part of its transportation service, it is within the present Acts. It then makes no difference that it is performed by a carrier affiliate rather than by the carrier itself. We think it plain that the definitions in question include at the very least those activities which would be transportation services when performed by a railroad but which it chooses to have performed by its affiliate." 326 U.S. at 453-455, 66 S.Ct. at 241, 90 L.Ed. at 197-198.
 
 
 76
 We have weighed the arguments of the protagonists and have concluded that the Mediation Board's determination was not clearly "made in excess of its delegated powers and contrary to a specific prohibition in the Act." Leedom v. Kyne, supra, 358 U.S. at 188, 79 S.Ct. at 184, 3 L.Ed.2d at 214. The statutory enumeration of "carrier" activities, 45 U.S. C.A. § 151, First, clearly indicates latitudinal coverage beyond the mere operation and maintenance of railroad engines, cars, and tracks. It cannot be doubted or disputed that the activities and equipment of the Docks Department do not have some umbilical and functional relation to the Terminal Railroad. Consequently, in view of the statutory words "any company * * * under common control with any carrier by railroad" and the expanding concepts of railroading, we cannot say that the Mediation Board's interpretation of the statute was error of the magna or summa quality necessary to vest the district court with jurisdiction. cf. Frito-Lay v. F. T. C., 5 Cir. 1967, 380 F.2d 8. We therefore reverse on the ground that the district court was without jurisdiction to enter the injunction prohibiting the Mediation Board from holding the representation election.
 
 
 77
 Having determined that this controversy is unripe for judicial intervention, we order that the jousting must terminate so that the electoral tournament may proceed. Let the epilogue to this epic be written.
 
 
 78
 Reversed.
 
 
 
 Notes:
 
 
 [1]
 Our earlier decisions are reported as follows: United States v. Feaster, 5 Cir. 1964, 330 F.2d 671; United States v. Feaster, 5 Cir. 1967, 376 F.2d 147, cert. denied, 389 U.S. 920, 88 S.Ct. 237, 19 L.Ed.2d 265
 
 
 [2]
 The application was filed pursuant to Section 2, Ninth, of the Railway Labor Act, 45 U.S.C.A. § 152, Ninth, which provides as follows:
 "Disputes as to identity of representatives; designation by Mediation Board; secret elections
 Ninth. If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. In the conduct of any election for the purposes herein indicated the Board shall designate who may participate in the election and establish the rules to govern the election, or may appoint a committee of three neutral persons who after hearing shall within ten days designate the employees who may participate in the election. The Board shall have access to and have power to make copies of the books and records of the carriers to obtain and utilize such information as may be deemed necessary by it to carry out the purposes and provisions of this paragraph."
 
 
 [3]
 Appellee Feaster is a director of the Docks Department and as such he is vested with all the power and authority of the department. Appellee Irvine is the department's general manager of operations
 
 
 [4]
 When the Docks Department initially refused to comply with the request for access to its books and records, the government in September, 1961, brought an action to restrain the Docks Department officials from continuing to refuse to allow inspection. The district court dismissed the government's complaint for failure to state a claim. This court reversed. United States v. Feaster, 5 Cir. 1964, 330 F.2d 671. The government then moved for a summary judgment and preliminary injunction prohibiting further lack of compliance. The district court denied these motions. The case at that time was of eight year vintage and we again reversed, holding that the Board was entitled to access to the requested records and an order of the district court granting same. United States v. Feaster, 5 Cir. 1967, 376 F.2d 147, cert. denied, 389 U.S. 920, 88 S.Ct. 237, 19 L.Ed.2d 265
 
 
 [5]
 In enjoining the election, the district court made the following findings of fact:
 "11. The general cargo piers and warehouses, bulk material handling plant, grain elevator, cotton compress and cold storage plant handle substantial quantities of goods and commodities which have not been shipped or received by rail; all of these facilities file tariffs with the Federal Maritime Board pursuant to the requirements of the Shipping Act of 1916, as amended, 46 U.S.C. 801 et seq.; none file tariffs or reports with the Interstate Commerce Commission; the employees of these facilities are civil service employees of the State and are covered by the State's `Merit System.' Title 55 Code of Alabama 1940, Chapter 9. Employees of the maritime facilities are now and have been subject to the Social Security Act, Section 301 et seq. of Title 42 of the United States Code, and the State of Alabama has been and is now paying Social Security taxes to the United States pursuant to the Federal Insurance Contributions Act, Sections 3121 et seq. of Title 26 of the United States Code.
 "12. The Terminal Railway is a separate, distinct and identifiable facility of the State. In addition to serving the maritime facilities of the State, the Terminal Railway serves private industries located on or adjacent to property owned by the State in the vicinity of the maritime facilities. The Terminal Railway operates under a certificate of convenience and necessity issued by the Interstate Commerce Commission; the books and records of the Terminal Railway are kept in conformity with the uniform system of accounts established by the Interstate Commerce Commission. The Terminal Railway files an annual report of all of its activities with the Interstate Commerce Commission on a form provided by the Interstate Commerce Commission. Since 1950 all of the employees of the Terminal Railway have been and are now represented by `labor organizations, national in scope,' authorized to represent employees of railroads pursuant to the Railway Labor Act, Section 151 et seq. of Title 45 of the United States Code. Since 1950 collective bargaining agreements between the Terminal Railway and labor organizations, national in scope, have been and are now in existence covering all employees of the Terminal Railway. Only employees of the Terminal Railway are covered by these collective bargaining agreements. The Terminal Railway pays taxes to the United States on each of its employees and officials pursuant to the Railroad Retirement Tax Act, Section 3201 et seq. of Title 26 of the United States Code and the Railroad Unemployment Insurance Act, Section 351 et seq. of Title 45 of the United States Code. Employees of the Terminal Railway are covered by the Railroad Retirement Act of 1935, Section 228a et seq. of Title 45 of the United States Code, and the Railroad Unemployment Insurance Act, Section 351 et seq. of Title 45 of the United States Code. The Terminal Railway performs switching services only. Switching services performed by the Terminal Railway consist of moving railroad cars from one point to another on interchange tracks maintained jointly by the Terminal Railway and line haul carriers, tracks of the Terminal Railway and private tracks. All of the compensation of the Terminal Railway is derived from switching and demurrage; the Terminal Railway does not receive any compensation as an originating carrier or as a line haul carrier. All Terminal Railway tariffs are on file with the Interstate Commerce Commission. The Terminal Railway is admittedly a `carrier' within the meaning of the acts of Congress regulating the `railroad world.'
 "13. None of the maritime facilities of the Department perform any service for the Terminal Railway in connection with the transportation of property by railroad or in connection with the receipt, delivery, elevation, transfer in transit, refrigeration, icing, storage or handling of property transported by railroad. The Terminal Railway makes no distinction between various maritime facilities of the Department and private industries. The maritime facilities of the Department are charged exactly the same amount for an extra switch as is charged to a private industry served by the Terminal Railway. No distinction is made between a maritime facility of the Department and a private industry with respect to services rendered by the Terminal Railway; all are treated equally. Demurrage and other charges are assessed against and collected from the maritime facilities of the Department under the same rules as demurrage is assessed against private industries.
 * * * * *
 "15. On October 21, 1959, without holding any hearing, the Board determined that the Department was a `carrier' in connection with the operation of the maritime facilities and found that the Board `has jurisdiction under the Railway Labor Act over the employees of the Alabama State Docks Department' * * *.
 * * * * * *
 "24. The National Labor Relations Act is not applicable to `any state or political subdivision thereof * * * or any person subject to the Railway Labor Act,' 29 U.S.C.A. 152(2). In Mobile Steamship Association (International Longshoremen and Warehousemen's Union), 8 N.L.R.B. 1297, 9 N.L.R.B. 60, the National Labor Relations Board exercised its expertise and found that the National Labor Relations Act did not apply to the Department or to the employees of the maritime facilities of the State here involved because the Department was a political subdivision of the State.
 "25. On March 9, 1968, Feaster and the State, by leave of Court first being had and obtained, amended their answer and filed four counterclaims, all of which seek a determination by this Court that the State is not a `carrier' within the meaning of the Railway Labor Act and other acts of Congress regulating the `railroad world' in connection with the operation by the State of the maritime facilities in Mobile and praying, among other things, for an immediate temporary restraining order and a preliminary injunction enjoining Lane [mediator for National Mediation Board] from conducting an election among the employees of the maritime facilities of the State and against Jansen from prosecuting Feaster and the State and its officers for claimed commissions of the crimes defined by the Railway Labor Act. On March 9, 1968, the Court granted a temporary restraining order as prayed against Lane."
 
 
 [6]
 In 45 U.S.C.A. § 151a (1954) we read: "The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions. * * *"
 
 
 [7]
 5 U.S.C.A. §§ 551, 701-706 (1967)
 
 
 [8]
 We find precedent for this distinction in the "corpus of `national labor policy' [which has] developed during the more than 30 years of administering our most comprehensive national labor scheme, the Labor Management Relations Act," which the Supreme Court has in the past referred to for assistance in construing the Railway Labor Act, Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 1969, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344. In areas where the National Labor Relations Board has considerable discretion, judicial review is very circumscribed. For example, the Board has great discretion in the determination of appropriate bargaining units, which determinations may involve the resolution of inter-union and/or craft jurisdictional disputes (as inSwitchmen's Union), and in these matters "the decision of the Board, if not final, is rarely to be disturbed." Packard Motor Car Co. v. N. L. R. B., 1947, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040, 1050. See also N. L. R. B. v. Tallahassee Coca-Cola Bottling Co., 5 Cir. 1969, 409 F.2d 201; N. L. R. B. v. Local 991, International Longshoremen's Ass'n, 5 Cir. 1964, 332 F.2d 66, 70; Retail, Wholesale, & Department Store Union v. N. L. R. B., 1967, 128 U.S.App.D.C. 41, 385 F.2d 301, 305. Where, however, the Board has ruled on a question of law which affects its jurisdiction (as in the case sub judice), the courts have a broader scope of review and may even substitute their judgment for that of the Board. For example, in Office Employees Intern. Union v. N. L. R. B., 1957, 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846, the Supreme Court held that the Board had misinterpreted the Act when it held that a labor organization which has employees should not be treated as an "employer" under § 2(2) of the Act. In holding that the organization was an employer, the Court gave the Board jurisdiction over the labor dispute.
 To summarize the foregoing, under the Labor Management Relations Act the scope of judicial review of representation disputes of the type involved in Switchmen's Union is very narrow. However, questions of statutory construction which relate to the extent of the Labor Board's jurisdictional power are subject to full judicial review. Viewing the language of Switchmen's Union in the light of this experience under the Labor Management Relations Act, it is arguable that the Supreme Court intended to proscribe review of National Mediation Board decisions only in areas where the Board was merely exercising discretionary powers granted by the Act, and that it did not intend to eliminate judicial review of questions relating to the extent of these Mediation Board powers. cf. Brotherhood of Ry. & S. S. Clerks v. National Mediation Board, 1966, 126 U.S.App.D.C. 55, 374 F.2d 269.
 
 
 [9]
 The armor forged by Congress so as to minimize judicial intrusions into findings and conclusions of the Board in labor matters has great tensile strength in insulating the Mediation Board as well as the National Labor Relations Boardcf. Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 1969, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344; International Brotherhood of Teamsters v. Brotherhood of Rail., A.&S. Cl., D.C.Cir.1968, 402 F.2d 196, 205 at fn. 19, cert. denied, 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119.
 
 
 [10]
 InSociedad Nacional the NLRB determined that it had jurisdiction over a representation dispute on certain foreign-flag ships and ordered an election to determine who would represent the crews of the ships. The Second Circuit, reversing a district court order, held that this was one of the rare situations where review was available prior to a final Board order and also that the Act did not apply to the maritime operations in question. In affirming, the Supreme Court pointed out that the Board's order had the effect of canceling the collective bargaining agreement between the foreign-flag shipowner and a foreign union, and that such action would have such serious international repercussions that immediate judicial intervention was necesary.
 In the case sub judice the ultimate issue is only which, if any, domestic unions will represent certain domestic employees working on dock facilities owned and operated by the State of Alabama. Certainly this dispute does not have grave international implications such as were involved in Sociedad Nacional.
 
 
 [11]
 The importance of Leedom v. Kyne to the case before us lies not only in its significance as an exception to the general rule of exhaustion, but also in the fact that it is the only undisputed exception toSwitchmen's doctrine that Mediation Board decisions in representation matters are unreviewable. "It is generally assumed that Leedom does apply to matters arising under the Railway Labor Act." International Brotherhood of Teamsters v. Brotherhood of Rail., A. & S. Cl., supra, 402 F.2d at 205, fn. 19.
 
 
 [12]
 29 U.S.C.A. § 159(b) (1) provides in relevant part: "[T]he Board shall not (1) decide that any unit is appropriate * * * if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit."
 
 
 [13]
 Leedom v. Kyne is also narrowly construed where the issue is whether and how the Mediation Board should conduct an election in a representation dispute over which the Board has jurisdiction. In International Brotherhood of Teamsters v. Brotherhood of Rail., A. & S. Cl.,supra, 402 F.2d at 204-205, Judge Leventhal, after reviewing Switchmen's Union, its ancestors and progeny, and its statutory setting, gives us a jurisdictional formulation of the scope of such review:
 "The nub of the matter is this: The courts must put aside the kinds of disquietude that we have sketched in deference to the doctrine of Switchmen's Union that the courts have no jurisdiction to intervene in representation disputes committed by the Railway Labor Act to final Board action. The Act puts a premium on speed of resolution; indeed the Board is directed to resolve representation disputes within 30 days. * * *
 "That purpose may be fulfilled only if the courts are extremely chary of involving themselves. The narrow exceptions to the `jurisdictional' bar created by Leedom v. Kyne, and similar cases must be instances of constitutional dimension or gross violation of the statute. The exception inevitably eliminates any strict concept of lack of jurisdiction, since it permits a peek at the merits. The reconciliation of doctrine lies not in concepts but in practicalities. The retention of the doctrine negativing jurisdiction to consider the merits serves to confine the assertion of jurisdiction to cases where the error on the merits is as obvious on the face of the papers as the violation of specific statutory language, without extension to `arguing in terms of policy and broad generalities as to what the Railway Labor Act should provide.' As this court has written, the Board's action must be `so plainly beyond the bounds of the Act, or * * * so clearly in defiance of it, as to warrant the immediate intervention of an equity court.' This case does not bring us to such a pass."
 
 
 [14]
 "The railroad world for which the [Railway Labor] Act was designed has been described as `a state within a state. Its population of some three million, if we include the families of workers, has its own customs and its own vocabulary, and lives according to rules of it own making.'" California v. Taylor, 1957, 353 U.S. 553, 565-566, 77 S.Ct. 1037, 1044, 1 L.Ed.2d 1034
 
 
 [15]
 Notwithstanding arguments to the contrary, the fact that the Docks Department is an agency of the State of Alabama does not of itself foil statutory applicability. Although 45 U.S.C.A. § 151, First, refers to a "company * * * under common control with any carrier by railroad," it is well settled that the Railway Labor Act applies to carriers operated by sovereign states as well as to corporations. In California v. Taylor, 1957, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034, the Supreme Court held:
 "The question presented here is whether the Railway Labor Act * * * applies to the State Belt Railroad, a common carrier owned and operated by the State of California and engaged in interstate commerce. For the reasons hereafter stated, we hold that it does.
 * * * * *
 "The fact that the Act's application will supersede state civil service laws which conflict with its policy of promoting collective bargaining does not detract from the conclusion that Congress intended it to apply to any common carrier by railroad engaged in interstate transportation, whether or not owned or operated by a State. The principal unions in the railroad industry are national in scope, and their officials are intimately acquainted with the problems, traditions and conditions of the railroad industry. Bargaining collectively with these officials has often taken on a national flavor, and agreements are uniformly negotiated for an entire railroad system. `[B]reakdowns in collective bargaining will typically affect a region or the entire nation.' [citation] It is by no means unreasonable to assume that Congress, aware of these characteristics of labor relations in the interconnected system which comprises our national railroad industry, intended that collective bargaining, as fostered and protected by the Railway Labor Act, should apply to all railroads. Congress no doubt concluded that a uniform method of dealing with the labor problems of the railroad industry would tend to eliminate inequities, and would promote a desirable mobility within the railroad labor force.
 "Finally, the State suggests that Congress has no constitutional power to interfere with the `sovereign right' of a State to control its employment relationships on a state-owned railroad engaged in interstate commerce. In United States v. State of California, supra [297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567], this Court said that the State, although acting in its sovereign capacity in operating this Belt Railroad, necessarily so acted `in subordination to the power to regulate interstate commerce, which has been granted specifically to the national government.' * * *
 "`California, by engaging in interstate commerce by rail, has subjected itself to the commerce power, and is liable for a violation of the Safety Appliance Act, as are other carriers * * *.'
 "That principle is no less applicable here. If California, by engaging in interstate commerce by rail, subjects itself to the commerce power so that Congress can make it conform to federal safety requirements, it also has subjected itself to that power so that Congress can regulate its employment relationships. [citations]." 353 U.S. 554, 566-568, 77 S.Ct. 1038, 1045-1046, 1 L.Ed.2d 1036, 1043-1044.